PATRIOT UNIVERSAL HOLDINGS, LLC,
TOMAHAWK MANUFACTURING, INC. and
ALKAR-RAPIDPAK-MP EQUIPMENT, INC,

        Plaintiffs,

  v.                                              Case No. 10-C-355

FORMAX, INC. and
PROVISUR TECHNOLOGIES, INC.,

        Defendants.

## DECISION AND ORDER

Defendants have moved to dismiss many of the claims in this action on the basis that the Plaintiffs lack standing. In particular, the Defendants assert that the named Plaintiffs are neither assignees nor licensees of the patents in suit. For the reasons given below, the motion will be denied.

**I. Background**

Three patents are presently at issue: the '650 patent, the '228 patent, and the '789 patent. The patents all relate to meat forming machines. Progressive Technology of Wisconsin, Inc. (known as PTI) was formed in 1994 by the sole inventor of the '228 and '650 patents, Jim Soper. Eventually Soper assigned all rights to these two patents to PTI, and PTI became a competitor to Defendant Formax in the business of manufacturing food patty forming machines. The business was ultimately not successful, however, and Paul Gehl, a PTI investor, started a new company called Form-It. Eventually litigation ensued between Paul Gehl and Dale Gehrig, PTI's president. As a

result of that litigation, Gehl obtained an option to buy the '228 patent from PTI for $10,000.

On December 23, 2004, after paying $10,000, Gehl signed a document titled "Assignment of Patent Rights," which purported to assign the '228 patent from PTI to Gehl. (ECF No. 109-15.) Gehl's signature appears on the document as that of an "authorized representative" of PTI. A year later, Gehl and Gehrig settled their dispute with an agreement transferring all of Gehrig's PTI stock to Gehl. Thus, by the end of 2005, Gehl believes he personally owned the '228 patent (which he had assigned himself from PTI), and, as PTI's sole shareholder, he controlled the '650 patent, which PTI still owned.

In 2008 Gehl filed with the Patent & Trademark Office two documents assigning these two patents to Plaintiff Patriot Universal Holdings, LLC. (ECF No. 102-17-18.) Plaintiffs admit that the document assigning the '228 patent erroneously states that PTI is the assignor; it is erroneous because by then Gehl had already assigned *himself* the patent on behalf of PTI. Then, in April 2010 (just days before this lawsuit was filed) Patriot entered into a licensing agreement with Plaintiff Tomahawk, who itself entered into a sub-licensing agreement with Plaintiff Alkar. Further facts are set forth below, as necessary.

## II. Analysis

To have standing, a plaintiff must have ownership or license rights at the time it files the action. *Abraxis Biosciences, Inc. v. Navinta LLC,* 625 F.3d 1359, 1366 (Fed. Cir. 2010). A court in circumstances like this is sometimes required to "trace the chain of title" linking the named inventors to the plaintiffs. *Enzo APA & Son, Inc. v. Geapag A.G.,* 134 F.3d 1090, 1092 (Fed. Cir. 1998). Here, the Defendants' arguments are three-fold. First, they argue that deficiencies in the 2008 assignment of the '650 patent render the assignment invalid. Second, they assert that PTI's

board of directors never approved the assignment to Patriot. Finally, they claim that other entities owned the patents in question.

**A. The '650 Patent**

The '650 patent was owned by PTI and then assigned to Patriot in 2008. (ECF No. 102-17.) Defendants assert a number of reasons why the document purporting to assign the '650 patent to Patriot is defective. First, they argue that although Gehl signed the document, he did not give any indication as to which entity he was representing. On page 3 of the assignment form, the document instructs that the signing party should "type or print the name of the above person authorized to sign on behalf of ASSIGNOR" and then list the party's title. (ECF No. 102-17 at 5.) That portion of the document is blank. Thus, according to the Defendants the assignment is ineffective.

This is an overly technical argument. "Construction of patent assignment agreements is a matter of state contract law." *Mars, Inc. v. Coin Acceptors, Inc.,* 527 F.3d 1359, 1370 (Fed. Cir. 2008). Under general contract principles, an agreement to assign a patent is created if the patentee expresses a clear intent to assign its rights to another. In an assignment such as this, the assignor is the only party making representations, warranties, covenants, and the like. For example, the assignment document at issue here reflects that the assignor is the party that "hereby sells, assigns and transfers to" the assignee the "entire right, title and interest" of the patent in question. (*Id.*) The document identifies the assignee several times as Patriot Universal Holdings, LLC, but apart from simply being identified, the assignee is not making any covenants or representations. Because the assignor is the only party entering into obligations, it is clear that Gehl was signing on behalf of the assign*or*, since that is the only party whose clear consent would need to be obtained in order to make all the representations, etc., found in the assignment. The fact that he did not fill in part of

3

the form does not undermine the assignment's legitimacy.

In addition, it must be remembered that Gehl controlled both PTI (the assignor) *and* Patriot (the assignee). Thus, he conceivably could have been signing on behalf of both entities. The point is that there can be no suggestion that the actual consent of the parties is somehow at issue here, because Gehl was on both sides of the transaction. Under general principles of state contract law, patent assignments do not require magic words to be binding, and deficiencies in forms do not invalidate the otherwise clear intent of the parties (or here, party). The intent of the document is clear, and that is all the law requires.

**B. The '650 and '228 Patents**

Defendants also argue that there is no evidence that Gehl had the authority to assign either the '650 or '228 patents to Patriot. Recall that in 2008 Gehl filed two assignments with the Patent and Trademark Office assigning the patents from PTI (the '650 patent) and himself (the '228) to Patriot. The Defendants argue that there is no evidence he had the power to assign patents on his own, and there is no evidence that PTI's board of directors authorized the assignment in 2008. Plaintiffs argue, however, that by 2008 (when the assignments to Patriot were made) Gehl had already been the sole shareholder and director of PTI for several years. The 2005 settlement agreement with Dale Gehrig transferred all of Gehrig's rights in PTI to Gehl, and besides Gehl there were no other shareholders. Thus, although it is true that relations between Gehrig and Gehl had been contentious in earlier years, an accord was reached settling those disputes, and Gehl became the company's sole owner in 2005. As such, he had full authority to transfer the patents in 2008. In addition, the '228 patent did not belong to PTI but to Gehl personally. Thus, the nature of PTI's board of directors is irrelevant to that transfer.

The Defendants respond that a company's actions must be taken under the direction of the board of directors, and there is no indication that PTI's board approved the assignment in 2008. Although Gehl may have been the sole owner of PTI by then, the Defendants point out that there is no evidence of whether there was a board of directors at that point, nor is there any indication that the board met to approve the transfer of the patent. Gehl claims that he was the sole director after 2005, but he does not apparently have evidence of this, apart from his own declaration. Accordingly, in the Defendants' view, there is no evidence that PTI properly authorized Gehl to assign the patent in 2008.

Again, however, this is a highly technical argument. Although it is true that corporations act under the direction of their boards of directors, PTI in 2008 was an entity solely owned by Gehl. As a general principle, owners of companies are entitled to take action on behalf of their companies. "If an officer of the company owns all the stock he may use the corporate assets as he sees fit and there can be no misappropriation of corporate assets by him." *L.R. Schmaus Co. v. C.I.R.,* 406 F.2d 1044, 1045 (7th Cir. 1969) (citation omitted). The assignment was therefore binding and enforceable. In addition, Gehl has filed a declaration under oath in which he testifies that he was the sole director. (ECF No. 108 at ¶ 2.) Absent evidence to the contrary—and there is no reason to believe any such evidence would exist—that suffices to demonstrate Gehl's authority to make the assignment.

Even if Gehl's own declaration did not suffice, the result would not change. The Defendants rely on Wis. Stat. § 180.0801, which states that "All corporate powers shall be exercised by or under the authority of, and the business and affairs of the corporation managed under the direction of, its board of directors, subject to any limitation set forth in the articles of incorporation." It is true that

5

companies are generally run under the power of their boards of directors, but the Defendants take this too far. Even if the Defendants were right that board approval was technically required, their argument is premised on corporate law rather than contract law, which is what governs assignments. At best, Defendants have shown that there is some question about whether PTI had a board of directors and whether (if it did) corporate formalities were followed. Although we may not be able to unearth whether there were technically other members of the board of directors, or whether a board even existed, or whether such board held a meeting to approve the assignment of the patent from one Gehl-owned entity to another, that does not mean Patriot, the assignee, lacks standing to enforce the assignment. An assignment is an agreement like any other, and if there is a meeting of the minds then the agreement may be enforced notwithstanding any corporate formalities. Here, there is no question that there was a meeting of the *mind*, not minds, because Gehl was transferring a patent from one of his companies to another.

Ultimately, when the company in question is wholly owned by a single man, it will take more than speculative questions about the board's role to undermine an ostensibly legitimate patent assignment. Under these circumstances a party challenging standing has to do more to carry the day than simply assert that there is no proof that the company's board approved the transfer. It would be an unusual case indeed where a company's board successfully opposed the actions of the company's sole shareholder, and absent any evidence to the contrary it is eminently reasonable to assume that the board either approved the assignment in this case or ratified it after the fact. (Assuming such a board even existed.) It is true that the burden is on the party invoking federal jurisdiction to show that he has standing, but to require a patent holder to provide chapter and verse documentation on relatively mundane transfers between his wholly-owned companies goes well

6

beyond what's required.

But these are side issues. The point remains that, as the sole shareholder and director, Gehl had the authority to dispose of his company's asset by assigning it to another company he also happened to own. And even if a board of directors existed at the time of the assignments, it is doubtful that its approval would have been required. *T-WOL Acquisition Co., Inc. v. ECDG South, LLC,* 725 S.E.2d 605, 617 (N.C. Ct. App. 2012) (noting "the consensus in other jurisdictions is that a sole shareholder of a corporation is generally free to dispose of corporate assets as he sees fit, except where such actions harm or defraud the corporation's creditors, or otherwise violate public policy.") Corporate formalities aside, the only parties potentially injured by an unapproved, *ultra vires* act would be the shareholders themselves. If the individual performing the act *is* the shareholder, and the *only* one, it would make no sense to conclude that his actions should be undone because he failed to seek approval of a board of directors, a board whose role is to represent his own interests.

**C. Other Potential Owners**

In an effort to avoid confusion, part of the story has been left out of the discussion thus far. In 2000, Paul Gehl created a company called Othmar Group, LLC. In 2006, Othmar purported to license both the '228 and '650 patents to co-Plaintiff Tomahawk. (ECF No. 102-20.) Then, just prior to the filing of this lawsuit, the parties apparently discovered that the true ownership of the patents was somewhat murky. In an April 2010 letter agreement between Tomahawk's Bob Tournour and Patriot's Paul Gehl, the parties state that after 2006, Othmar's interest in the patents was transferred to Patriot, and the document clarifies that Patriot is now considered the licensor to Tomahawk rather than Othmar. (ECF No. 102-21.) These documents imply that Othmar had

owned the patents when it licensed them in 2006.

The idea that Othmar had ever owned rights to the patents contradicts the evidence set forth above, which is that PTI and Gehl had owned the two patents and then assigned them to Patriot by means of the documents filed in 2008 with the Patent and Trademark Office. Given this inconsistency, the Defendants argue that Othmar must be the true owner of the patents, which makes the purported assignments described above invalid.

Although the documents cited suggest that Othmar was the licensor, there is no documentation supporting the idea that Othmar itself had ever actually been assigned the patents in the first place. As detailed above, PTI owned the '650 patent and Gehl owned the '228 patent. Gehl explains that he was under the misapprehension that Othmar was the owner of the patents, and such an error is understandable given the number of his various business entities. (ECF No. 108 ¶ 8.) Patent assignments must be in writing, and there is no written evidence that Othmar had actually ever been assigned the patents in question. Accordingly, Othmar's purported license to Tomahawk does not undermine Patriot's own claim to the patents— one company cannot wrest legitimate patent rights from another simply by saying it has them.[1]

Defendants respond that if Othmar never actually owned the patents, then Tomahawk's own standing (as well as that of Alkar, a sublicensee) is compromised because its license is premised on the very assignment from Othmar that the Plaintiffs now reject. That is, Plaintiffs cannot have it both ways: if they want to back away from the notion that Othmar ever had rights to the patents, that

---

[1] In addition to Othmar, the Defendants also identify Form-It as an owner of the patents. This assertion is based on a 2003 business plan indicating that Form-It owned both of the patents. (ECF No. 102-25.) Again, however, a document simply stating that one company owns a patent does not make it so.

8

means they must also reject the idea that Tomahawk's license was valid.

Plaintiffs respond that Tomahawk's standing is premised not on any earlier agreement with Othmar but on the April 2010 letter agreement. The 2010 agreement, entered into just days before this lawsuit was filed, appears to be an attempt to clean up some of the issues described herein. In short, the agreement attempts to place Patriot, rather than Othmar, in the role of licensor while keeping everything else in the original license intact. (ECF No. 102-21.) Although it erroneously states that Othmar's interest in the patents had been assigned to Patriot (Othmar never had any interest in the patents), that is irrelevant because it is an agreement between Tomahawk and Patriot, the true owner of the patents. The agreement sets forth Patriot's and Tomahawk's intent to enter into an exclusive license agreement notwithstanding any errors that might have been made earlier. There is little doubt that the 2010 agreement is an *ex post facto* effort to solve the problems identified above, and as such it is not the most elegant of instruments. But what's clear is that as of April 2010 there is a meeting of the minds between Patriot, the patent owner, and Tomahawk, the licensee, and that is enough to grant standing to Tomahawk and Alkar.[2]

## III. Conclusion

The Defendants are understandably frustrated by what they view as Gehl's disregard for corporate form and recordkeeping, which led to the unfortunate yet substantial questions about

---

[2]Defendants also argue that if the 2010 agreement is the source of Tomahawk's and Alkar's rights, then they would not be entitled to damages dating back to 2006. But that is a question of damages, not standing. For present purposes it is enough to identify a contract that expresses the parties' intent to create a license.

In addition, Defendants cite the 2006 agreement between Othmar and Tomahawk as evidence that Othmar—not Patriot—owned the '789 patent. For the same reasons identified above, however, a document stating that one company owns a patent does not, in itself, create a valid patent assignment.

9

standing that have been addressed herein. However, I am satisfied that the Plaintiffs have established standing to pursue the claims in this action. Accordingly, the motion to dismiss [100] is **DENIED**. The motion to file a sur-reply [121] is **GRANTED**. The motion to seal [106] is **GRANTED**, as the materials contained therein are confidential business records. Exhibits 20, 33, and 34 attached to the Declaration of Sara Tonnies Horton in Support of Defendants' Partial Motion to Dismiss for Lack of Subject Matter Jurisdiction and Exhibits G, J, and K to the Declaration of T. Wickham Schmidt in Support of Plaintiffs' Brief in Opposition to Defendants' Motion to Dismiss shall be preserved under seal.

**SO ORDERED** this 4th day of June, 2014.

    /s William C. Griesbach
William C. Griesbach, Chief Judge,
United States District Court